UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

UNITED GRANTS OF AMERICA LLC,               )
a Puerto Rico limited liability company,     )
                                             )
                    Plaintiff,               )
                                             )
         -against-                           )        Case No. 2:26-cv-1255
                                             )
DANIEL EHRLICH,                              )        **JURY TRIAL DEMANDED**
an individual,                               )
                                             )
                    Defendant.               )

------------------------------------------------------------- x

**VERIFIED COMPLAINT AND REQUEST
FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND
PERMANENT INJUNCTION**

Plaintiff United Grants of America LLC ("UGA" or "Plaintiff"), for its cause of action for

injunctive and other relief against Defendant Daniel Ehrlich ("Ehrlich" or "Defendant"), states as

follows:

**NATURE OF THE CASE**

This action arises from Defendant's wrongful efforts to damage UGA's business by: (i)

breaching written restrictive covenants and confidentiality obligations he signed as a condition of

association, (ii) soliciting UGA's clients to terminate or diminish their relationships with UGA,

(iii) interfering with UGA's current and prospective client relationships, (iv) defaming UGA in

communications with UGA's clients and prospects; and (v) soliciting UGA personnel to terminate

their relationship with UGA. UGA seeks a temporary restraining order, preliminary injunction,

and permanent injunction to halt the ongoing, irreparable harm that Defendant is causing to

Plaintiff's good will, reputation, and operations, substantial pecuniary damages to compensate

UGA for the harm already inflicted, and the costs of this action, including attorneys' fees, pursuant

to the prevailing party attorneys' fee clause of the parties' relevant agreement.

## PARTIES

1.      Plaintiff UGA is a limited liability company organized under the laws of the Commonwealth of Puerto Rico that is engaged in the business of identifying, consulting, and facilitating farmers for grants and programs issued through the USDA and its various agencies on the federal and state level, along with other related services across the U.S. It is headquartered in the Commonwealth of Puerto Rico at 1250 Ave. Ponce de Leon, STE 301 PMB 2012, San Juan, Puerto Rico 00907.

2.      Elias Blake Tacher ("Tacher") is the sole member of UGA. He is domiciled in, and a resident of, the Commonwealth of Puerto Rico in San Juan.

3.      Upon information and belief, Defendant is a natural person and domiciliary of Nassau County, New York.

4.      Upon information and belief, Defendant resides at 350 Shore Rd, Glenwood Landing, New York 11547, in Nassau County, New York.

5.      Defendant directed Plaintiff to send any physical notice due to him pursuant to the parties' agreements to 350 Shore Rd, Glenwood Landing, New York 11547, in Nassau County, New York.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Puerto Rico for diversity purposes; Defendant is a citizen of New York; and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. Plaintiff asserts claims under  18 U.S.C. § 1836, the Defend Trade Secrets Act.

7.

8.     This Court has personal jurisdiction over Defendant because he resides in this District and committed tortious acts in this District, including contacting UGA's clients while located in New York.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**A.  Defendant's Association with UGA and Agreements**

### i.  The Agreements

10.    UGA engaged Defendant as an independent contractor with the title "Account Executive", pursuant to a Temporary Employment Agreement effective on or about November 22, 2024 ("TEA"). *See* Ex. A, TEA.

11.    Pursuant to the TEA, Defendant acknowledged that he would have access to confidential information. *See* Ex. A.

12.    Defendant agreed not to disclose to third parties the confidential information he had access to except by prior written authorization. *See* Ex. A, TEA.

13.    Pursuant to the TEA, Defendant also agreed to sign a Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement. *See* Ex. A, TEA.

14.    On November 22, 2024, Defendant executed a Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement ("NDA") as required by the TEA. *See* Ex. B, NDA.

15.    The NDA's Non-competition provisions reads as follows:

3

3. **Non-competition.** The Employee hereby expressly acknowledges that his know-How, resources, business acumen, and skills are readily adaptable to different businesses other than the Business and to different products and is not unduly limited by the extent of the Territory so that the enforcement of any of the covenants herein contained against would not prevent him from effecting a satisfactory utilization of his skills and a satisfactory realization of his potential. Therefore, Employee covenants and agrees that he shall not, in any capacity, during the Non-competition Period, either directly or indirectly, partially or wholly, within the Territory: (i) engage, advise, provide, or perform for the benefit of a Competing Business equal and/or similar responsibilities as those he performed in benefit of the Company and/or its Affiliates, its business and management; (ii) manage, operate, supervise, administer, organize, engage in, conduct, oversee, direct, run, aid, support, assist, or in any way participate in a Competing Business, either on his own behalf or on behalf of any other Person, whether as an employee, agent, consultant, independent contractor, or otherwise; and/or (iii) have a financial interest in, own, control, join in, or be in any way connected with or affiliated with

any Competing Business, whether as a shareholder, investor, member, owner, partner, proprietor, director, officer, administrator, manager, lender, consultant, or otherwise.

*See* Ex. B, NDA, ¶ 3.

16.    The Non-competition Period is defined in the NDA as follows:

(h) "Non-competition Period" means the months after the date of termination of employment, as set forth below:

- **12 months:** Arizona, Connecticut, Illinois, Massachusetts, Nevada, New Hampshire, Ohio, Rhode Island, Utah, Vermont.
- **18 months:** Idaho, New Mexico, Oregon, Washington.
- **24 months:** Alabama, Arkansas, Delaware, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Minesota, Mississippi, Missouri, New Jersey, New York, North Carolina, South Dakota, Virginia, Wyoming, Wisconsin.
- **36 months:** Alaska, Colorado, Hawaii, Indiana, Iowa, Maine, Michigan, Montana, Nebraska, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia.

*See* Ex. B, NDA, ¶ 1(h).

17.    The NDA's Non-solicitation of Clients reads as follows:

5. **Non-solicitation of Clients.** Employee covenants and agrees that he shall not during the Non-competition Period, either directly or indirectly, on his own behalf or on behalf of any other Person, (i) contact, offer, service, solicit, intervene, or call upon, or otherwise attempt to divert any Client for the purpose of providing services or products that are competitive to the Business, and/or (ii) induce or attempt to induce a Client to cease doing business with the Company or its Affiliates, or in any way interfere with the relationship between any Client of the Company or its Affiliates.

*See* Ex. B, ¶ 5.

4

18.     The NDA's Non-Disclosure of Confidential Information reads as follows:

> **8. Non-Disclosure of Confidential Information.** Employee agrees, without any time limitation, including during and after the term of this Agreement and his/her employment with the Company, that the Employee shall not disclose, use, or permit access, to any unauthorized person or entity, including within the Company, or use for the Employee's own purposes or gain, or that of any friend, relative or other third party, any Confidential Information without the prior written consent of the Company, unless and to the extent that the aforementioned matters (a) become generally known to and available for use by the public other than as a result of the Employee's acts or omissions in violation of this Agreement or (b) were within the Employee's possession prior to its being obtained by the Employee in the course of the Employee's employment with the Company; provided, however, that if the Employee receives a request to disclose Confidential Information pursuant to a deposition, request for information or documents in legal proceedings, subpoena civil investigative demand, governmental or regulatory process or similar process, (a) the Employee shall promptly notify the Company in writing, and consult with and assist the Company in seeking a protective order or request for other appropriate remedy; (b) in the event that such protective order or remedy is not obtained, or if the Company waives compliance with the terms hereof, the Employee shall disclose only that portion of the Confidential Information which, in the written opinion of the Employee's legal counsel, is legally required to be disclosed and shall exercise reasonable best efforts to assure that confidential treatment shall be accorded to such Confidential Information by the receiving person or entity; and (c) the Company shall be given an opportunity to review the Confidential Information prior to disclosure.

*See* Ex. B, ¶ 8.

19.     Confidential Information is defined in the NDA as follows:

> (f) "Confidential Information" means all Technical and/or Business information including: financial information, investment performance results or rates of return of the Company or any of the Protected Parties; technical information or reports; trade secrets; proprietary information, unwritten knowledge, and "know-how;" operating instructions; training manuals; Client lists; Client buying records and habits; product/service sales records and documents and product/service development, marketing, and sales strategies; market surveys; marketing plans; profitability analyses; product/service cost; long-range plans; information related to pricing, competitive strategies, and new product/service development; personnel-related information, except as prohibited from non-disclosure by law; commercial contracts; and lists of suppliers; any information marked or treated as "confidential" or "privileged" by the Company; and any other trade secrets and/or confidential and/or proprietary business information of or regarding the Company (including information created or developed, in whole or in part, by Employee), which is not generally known about the Company or about its business.

5

> Confidential Information includes not only the information itself but also all documents containing such information, and any and all such information is maintained in electronic or other form. For purposes of this Agreement, Confidential Information shall not include any information which Employee can establish was (i) publicly known or (ii) becomes publicly known and made generally available after disclosure to Employee by the Company, through means other than Employee's breach of his/her obligations under this Agreement. Without limiting the foregoing, the Employee agrees to keep confidential the existence of, and any information concerning, any dispute between the Employee and the Company, except as prohibited by law, or that the Employee may disclose information concerning such dispute to the court that is considering such dispute or to the Employee's legal counsel or representative provided that such counsel or representative agrees not to disclose any such information other than as necessary to the prosecution or defense of such dispute.

*See* Ex. B, ¶ 1(f).

20.     The Survival provision in the NDA that governs the Non-Disclosure of Confidential Information provision reads as follows:

> 21. **Survival.** This Agreement shall be effective on the date of signature. The nondisclosure provisions of this Agreement shall survive any termination, cancellation or expiration of this Agreement and Employee's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Company sends the Employee written notice releasing Employee from this Agreement, whichever occurs first. Further the obligation not to disclose Confidential Information shall not be affected by bankruptcy, assignment, attachment, or seizure procedures, whether initiated by or against Employee.

21.     The NDA is governed by and subject to "the laws of the States where it will be enforced . . . irrespective of the fact that a party hereto may be a resident of another state or jurisdiction." *See* Ex. B, ¶ 13.

22.     Plaintiff seeks to enforce the NDA in New York.

23.     Therefore, New York law applies to this action.

24.     The NDA permits Plaintiff to obtain injunctive relief.

25.     Defendant expressly recognized that any breach of his obligations under the Agreement are likely to result in irreparable injury to UGA, and thus in the event of Defendant's breach.

26.  According to the NDA, UGA "shall be entitled to obtain specific performance of this Agreement through injunctive relief and such ancillary remedies of an equitable nature as a court may deem appropriate." *See* Ex. B, ¶ 12.

27.  The NDA also contains a prevailing-party attorneys' fees' provision. It reads as follows:

> 18. **Expenses of Enforcement.** The non-prevailing Party shall be liable to, and will pay the prevailing Party, for all costs and expenses, including, but not limited to, reasonable attorneys' fees incurred by the prevailing Party in the enforcement, defense or interpretation in any respect of any of its rights under this Agreement, whether in litigation or otherwise.

*See* Ex. B, ¶ 18.

28.  On or about November 22, 2024, the Parties also signed another Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement referencing Puerto Rico (the "PR NDA"), which contains parallel confidentiality and non-solicitation obligations and likewise authorizes injunctive relief. *See* Ex. C, PR NDA.[1]

## ii.  Defendant's Association with UGA

29.  Defendant's position as an Account Executive effectively required him to generate revenue for Plaintiff by forming relationships with farmers, or, more often, maintaining UGA's pre-existing relationships with farmers.

30.  UGA then used its expertise to help those farmers find and navigate government programs that award or loan the farmers money.

31.  UGA also uses its expertise to help farmers stay compliant with the terms of the relevant program.

---

[1] Plaintiff does not seek any relief with respect to the PR NDA.  This action solely concerns the NDA and TEA. Plaintiff reserves all rights at equity and law to seek additional relief in Puerto Rico pursuant to the PR NDA as may be necessary based on Defendant's future conduct.

32.     To that end, Plaintiff provided Defendant with "Confidential Information" as defined in the NDA (and below), including, but not limited to, Client lists and leads, among the other Confidential Information.

33.     The NDA is critical because, prior to Defendant's association with UGA, Defendant did not work in the same industry as UGA and had no clients of his own.

34.     Therefore, Defendant entirely used Plaintiff's Client lists, contact information, leads, good will, expertise, "know-how," and other Confidential Information to obtain grants on behalf of clients, and generate revenue for Plaintiff.

35.     Defendant's TEA entitled him to a salary of $85,000 annually and commissions of, in Plaintiff's discretion, up to 5% of revenue generated by Defendant. *See* Ex. A, TEA.

36.     Defendant never alleged that UGA's pricing was in any way illegal prior to his termination.

37.     Defendant always accepted commissions and discretionary bonuses of up to $30,000 prior to his termination.

38.     During his association with UGA, Defendant had access to UGA's Confidential Information.

39.     Specifically, Defendant had access to UGA's:

    a.  "financial information,"

    b.  "investment performance results or rates of return of the Company [UGA],"

    c.  "technical information or reports,"

    d.  "trade secrets,"

    e.  "proprietary information,"

    f.  "unwritten knowledge,"

g.  "know-how,"

h.  "operating instructions,"

i.  "training manuals,"

j.  "Client lists,"

k.  "Client buying records and habits,"

l.  "product/service sales records and documents and product/service development, marketing, and sales strategies"

m.  "market surveys,"

n.  "marketing plans,"

o.  "profitability analyses,"

p.  "product service/cost,"

q.  "long-range plans,"

r.  ""information related to pricing, competitive strategies, and new product/service development,"

s.  ""personnel-related information,"

t.  "commercial contracts,"

u.  ""lists of suppliers,"

v.  "any information marked or treated as 'confidential' or 'privileged' by the Company [UGA],"

w.  "any other trade secrets and/or confidential and/or proprietary business information of or regarding the Company [UGA] (including information created or developed, in whole or in part, by Employee [Ehrlich]), which is not generally known about the Company [UGA] or about its business," and

9

x. other confidential/proprietary information, including, but not limited to, client identities and decision-makers, contact information, pricing, proposals, and engagement status, by virtue of his Account Executive role and system access.

y. "Confidential Information includes not only the information itself but also all documents containing such information, and any and all such information is maintained in electronic or other form." *See* Ex. A, TEA; *see* Ex. B ¶ 1(f) (collectively, the "Confidential Information").

40. Upon information and belief, Defendant was using his own personal email rather than his company email to conduct business and retain Confidential Information.

41. Defendant was also using his own personal computer to conduct business and retain Confidential Information.

### iii.  **Defendant's Association with UGA is Terminated**

42. In or about February of 2026, Plaintiff approached Tacher and demanded that Defendant be awarded a commission of 30% on five deals that Defendant claimed he originated.

43. Plaintiff, via Tacher, refused Defendant's initial demand.

44. Tacher informed Defendant that Plaintiff and Defendant had a valid and enforceable TEA, and that Defendant was entitled commissions of no more than 5% of the revenue that Defendant originated.

45. But, Tacher, realizing Ehrlich was upset about his compensation, attempted to negotiate an updated agreement in connection with the five deals that Ehrlich demanded increased commissions on.

46. Defendant continually demanded a payment of 30% of commissions during these negotiations.

47.     Tacher, on behalf of UGA, refused to cause UGA to pay Defendant 30% of Defendant's supposed originations.

48.     When Plaintiff refused to award Defendant additional discretionary commissions, Defendant implied that he would sabotage Plaintiff's business by contacting clients using Confidential Information, and urging clients to cease doing business with Plaintiff.

49.     Defendant continually harassed Tacher for more and more money.

50.     When UGA refused to give Plaintiff commissions of 30%, Defendant told Tacher that UGA's clientele and leads were, in fact, Defendant's clients and that Defendant must be "bought out" of Plaintiff's business for approximately $150,000.

51.     Tacher, on behalf of UGA, informed Defendant that Defendant had no ownership interest in UGA and could not/would not be "bought out."

52.     Defendant became irate and made a scene in front of UGA's staff, insisting that UGA's clients and leads belonged to him and asserting to UGA personnel that the TEA and NDA are unenforceable.

53.     As a result of Defendant's conduct, on February 25, 2026, Plaintiff terminated Defendant.

54.     Defendant's association with UGA ended on or about February 25, 2026 (the "Separation Date").

55.     Defendant's Separation Date triggered the twenty-four month long Non-competition Period that also applies to the Non-solicitation provision. *See* Ex. B, NDA, ¶¶ 1(h), 3, 5.

56.     The Non-competition Period terminates on February 25, 2028.

57.     The date on which the Non-competition period terminates is after the date of the

filing of this lawsuit.

58. The Non-competition provision is no greater than is required for the protection of UGA's legitimate interest, does not impose undue hardship on Defendant, and is not injurious to the public.

59. The Non-competition period, as applied to the NDA's non-solicitation provisions, is no longer than necessary to protect UGA's legitimate interest, does not impose undue hardship on Defendant, and is not injurious to the public.

60. The Separation Date did not affect Defendant's confidentiality obligations.

61. Defendant's duty to hold Confidential Information in confidence "remain[s] in effect until the Confidential Information no longer qualifies as a trade secret or until Company sends [Defendant] written notice releasing [Defendant] from this Agreement [the NDA], whichever occurs first." *See* Ex. B, NDA, ¶ 21.

62. The Confidential Information continues to qualify as a trade secret as of the date of this writing.

63. Plaintiff has not sent Defendant written notice releasing him from the NDA as of the date of this writing.

64. Consequently, Defendant's confidentiality obligations remain in full force and effect.

## B. **Defendant's Defamatory Campaign to Disrupt UGA's Business**

65. Following the Separation Date, Defendant embarked on a campaign to disrupt UGA's business and cause UGA irreparable harm.

66. Upon information and belief, Defendant is using UGA's Confidential Information to identify and contact UGA's clients and affiliates.

67.     For example, 68 Produce LLC is a Client of UGA as defined in the TEA.

68.     UGA provides services to 68 Produce LLC under the federal MASC program .

69.     The MASC, or "Marketing Assistance for Specialty Crops," is a federal program that provides financial assistance to specialty crop producers to help them expand domestic markets or develop new markets for their crops. *See* Farm Service Agency, *Marketing Assistance for Specialty Crops (MASC)*, FSA (Dec. 2024), https://www.fsa.usda.gov/resources/ programs/marketing-assistance-specialty-crops-masc.

70.     68 Produce LLC previously paid UGA $135,000 for UGA's MASC Services.

71.     On or about February 26, 2026, Defendant sent 68 Produce LLC a word document, that he created, which contained instructions for reporting illegal or allegedly illegal fee practices. *See* Ex. D, Defendant's Fabricated Document.

72.     The metadata of that document confirms that it was created by Defendant. *See* Ex. E, Metadata From Defendant's Fabricated Document.

73.     Upon information and belief, this document that Defendant created was intended to cause 68 Produce LLC to believe that the USDA had performed an investigation of UGA and determined that UGA actually charged illegal fees, entitling UGA's clients to refunds.

74.     As a result, on or about February 27, 2026, 68 Produce LLC contacted UGA and demanded that UGA return the $135,000 fee paid by 68 Produce LLC to UGA for MASC Services. *See* Ex. F, Emails with UGA and 68 Produce LLC.

75.     68 Produce LLC informed UGA that Defendant's communication actually caused 68 Produce LLC to believe the USDA investigated UGA's fee practices.

76.     Based on Defendant's communication, 68 Produce LLC informed UGA that it concluded UGA's fee practices were illegal, and that 68 Produce LLC was entitled to a refund.

77.     Upon information and belief, Defendant has sent this same document to other UGA clients.

78.     Upon information and belief, those clients include, but are not limited to, Direct Advantage Farms LLC.

79.     As a result of receiving Defendant's communication, Direct Advantage Farms LLC demanded that UGA return $42,825.70 related to UGA's performance of MASC services.

80.     Client terminations of UGA contracts will cause UGA to suffer substantial damages, including lost revenue, lost profits, and harm to goodwill and reputation.

81.     Plaintiff is currently attempting to convince 68 Produce LLC and Direct Advantage Farms LLC that its services are not illegal and attempting to otherwise salvage its relationship with 68 Produce LLC.

82.     In addition, on February 25, 2026, Defendant contacted Patrick Wiles ("Wiles").

83.     Wiles is an affiliate of UGA who has referred more than thirty-five high-value clients to UGA.

84.     Defendant told Wiles that UGA's fees were excessive.

85.     Defendant also told Wiles that UGA was engaged in illegal activities.

86.     The purpose of Defendant's call to Wiles was to undermine UGA's relationship with Wiles and otherwise cause UGA to lose good will and a strong client referral source, as well as existing clients referred by Wiles.

87.     Defendant told Wiles that Defendant intended to undermine UGA's relationships with clients.

88.     After Wiles spoke with Defendant, Wiles informed Tacher of Wiles' conversation with Defendant.

89.    Specifically, Wiles represented to Tacher that Wiles was disturbed by Defendant's behavior.

90.    Wiles expressed fear that Defendant would harm the business and client relationships of both Wiles and UGA.

91.    Defendant previously worked directly with six of UGA's clients sourced through Wiles.

92.    As a result of Defendant's work for Wiles, Defendant possesses contact information for the farmers that UGA services through Wiles.

93.    Defendant possesses contact information for the remaining twenty-nine UGA clients sourced through Wiles.

94.    Upon information and belief, Defendant is contacting or attempting to contact all thirty-five UGA contacts sourced through Wiles for the purpose of inducing them to cease doing business with UGA, soliciting their business, or otherwise interfering with United Grants' relationships.

95.    Due to Defendant's false allegations to Wiles, UGA is at risk of losing at least thirty-five potential clients that Wiles referred to UGA.

96.    In addition, sometime before February 27, 2026, Defendant contacted another UGA affiliate, Edward Ybarra ("Ybarra").

97.    Ybarra is an affiliate of UGA who has referred more than twenty-three high-value clients to UGA.

98.    Defendant alleged to Ybarra that the fees UGA charges are illegal.

99.    Ybarra works for an insurance company and holds certain insurance license(s), and was very disturbed by Defendant's behavior.

100. Ybarra informed Tacher of Ybarra's conversation with Defendant.

101. Ybarra expressed fear to Tacher that Defendant would harm Ybarra's business and client relationships.

102. Ybarra represented to Tacher that, pending a conversation with Ybarra's legal counsel, Ybarra will refuse to do business with UGA based upon Defendant's allegations.

103. Upon information and belief, Ybarra believed Defendant's statements concerning UGA's alleged wrongful behavior.

104. Upon information and belief, Ybarra believed that he would lose his insurances license(s) as a result of UGA's supposed wrongdoing.

105. Ybarra told UGA clients, including Sebastian Guillen Berries ("Berries"), that UGA would return money to UGA clients because UGA's actions were wrongful.

106. Ybarra's statement to Berries were directly caused by Defendant's false statements.

107. Berries has demanded that money paid to UGA in consideration of UGA's services be returned.

108. Another UGA account executive subsequently spoke to Berries to try to perform "damage control."

109. In response to UGA's outreached, Berries simply called UGA "liars."

110. Defendant contacted Ybarra for the purpose of causing UGA to lose its relationship with Ybarra and the clients generated through Ybarra.

111. On March 3, 2026, Ybarra contacted Tacher and informed Tacher that Defendant solicited UGA client Chava Vasquez ("Vasquez") to terminate its relationship with UGA and engage Defendant.

112. Vasquez terminated UGA on March 3, 2026 at Defendant's behest.

113.     Upon information and belief, Vasquez engaged Defendant based on Defendant's solicitations.

114.     UGA's total expected fees from work performed on behalf of Vasquez or Vasquez's business was $51,187.51.

115.     Ybarra further expressed to Tacher consternation that he and UGA lost a client to Defendant.

116.     Further, sometime before February 28, 2026, Defendant contacted yet another UGA affiliate, Marty Zaninovich ("Zaninovich").

117.     Zaninovich is an affiliate of UGA who has referred at least seven high-value clients to UGA.

118.     Defendant alleged to Zaninovich that the fees UGA charges are illegal.

119.     After this conversation with Defendant, Zaninovich informed Tacher of his conversation with Defendant.

120.     Zaninovich also informed Tacher that he was disturbed by Defendant's behavior and expressed fear that Defendant would harm business and client relationships.

121.     Defendant contacted Zaninovich for the purpose of injuring Plaintiff's relationship with Zaninovich and the clients referred to UGA through Zaninovich.

122.     On or about February 25, 2026, Defendant contacted UGA client T&D Honeybee LLC ("T&D Honeybee") and induced it to terminate its relationship with UGA.

123.     Immediately thereafter, on February 25, 2026,  T&D Honeybee e-mailed UGA and terminated UGA's FSA authorization and all other agreements with T&D Honeybee.

124.     Tacher called T&D Honeybee to discuss the basis of the termination.

125.      T&D Honeybee informed Tacher that Defendant called T&D Honeybee and made

17

statements that led to the decision to terminate UGA's services.

126. Upon information and belief, Defendant is weaponizing Confidential Information to contact other UGA clients and spew false accusations.

127. Defendant has acted, and is currently acting, willfully and maliciously, intending to harm UGA and divert UGA's clients and business expectancies.

128. Moreover, Defendant contacted at least one current employee or independent contractor of UGA to induce her to terminate her relationship with UGA.

129. On or about February 19, 2026, Defendant contacted Melissa Sessions ("Sessions") to disparage UGA's practices and Tacher.

130. Upon information and belief, Defendant contacted Sessions for the purpose of inducing her to terminate her association with UGA.

131. Defendant referred to Tacher as a "micromanaging," personnel, "visibly disturbed," and described UGA's work as "unimpressive," and alleged "you guys do not know what you're doing."

132. Defendant further described Tacher as "very high-strung, very difficult," and stated that Tacher "has no friends, and "has kind of a lonely existence," stated that UGA is "being greedy," and more.

**COUNT I**
**BREACH OF CONTRACT – Non-Solicitation Provision**

133. UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

134. The NDA is a valid and enforceable contract supported by adequate consideration.

135. Pursuant to the NDA, Defendant agreed to not "induce or attempt to induce a Client to cease doing business with the Company or its Affiliates." *See* Ex. B, NDA, ¶ 5.

136. Pursuant to the NDA, Defendant also agreed to not "in any way interfere with the

relationship between any Client of the Company or its Affiliates." *See* Ex. B, NDA, ¶ 5.

137. 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez are Clients of UGA as defined in the TEA and NDA.

138. Defendant contacted 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC , and Vasquez using Confidential Information he gained during his association with UGA to induce or attempt to induce 68 Produce LLC, T&D Honeybee, and Vasquez to terminate their contracts with UGA and cease doing business with UGA. *See* Ex. F, Emails with UGA, 68 Produce LLC, and Direct Advantage Farms LLC. This was in direct violation of the Non-solicitation provision. *See* Ex. B, NDA, ¶ 5.

139. By contacting 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez, Defendant also interfered with the relationship between 68 Produce LLC and UGA, the relationship between T&D Honeybee and UGA, the relationship between Direct Advantage Farms LLC and UGA, and the relationship between Vasquez and UGA.

140. This was in direct violation of the Non-solicitation provision. *See* Ex. B, NDA, ¶ 5.

141. Further, by contacting UGA affiliates Wiles, Ybarra, and Zaninovich, Defendant attempted to induce the clients these UGA affiliates referred to cease doing business with UGA, and to induce Wiles, Ybarra, and Zaninovich from ceasing to refer clients to UGA.

142. The Non-solicitation provision is currently valid, as it spans the Non-competition Period. *See* Ex. B, NDA, ¶ 5. The Non-competition Period terminates on February 25, 2028. which is after the date of the filing of this lawsuit.

143. The NDA provides for injunctive relief and awards attorneys' fees to the prevailing party. *See* Ex. B, NDA, ¶¶ 12, 18.

144. As a direct and proximate result, UGA has suffered and will continue to suffer

irreparable harm, including loss of client relationships and goodwill, and monetary damages in an amount to be determined at trial, but in no event less than $200,000.

## COUNT II
## BREACH OF CONTRACT – Non-Disclosure Provision

145. UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

146. The NDA is a valid and enforceable contract supported by adequate consideration.

147. Pursuant to the NDA, Defendant agreed to not "disclose, use, or permit access, to any unauthorized person or entity . . . or use for [Defendant's] own gain . . . any Confidential Information without the prior written consent of [UGA.]" *See* Ex. B, NDA, ¶ 8.

148. Confidential Information includes but is not limited to "financial information; . . . Client lists; . . . commercial contracts; . . . any information marked or treated as 'confidential' or 'privileged' by [UGA.]" *See* Ex. B, NDA, ¶ 1(f).

149. Upon information and belief, Defendant retained UGA's client list because (1) he knew 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez were clients of UGA and had a contract with UGA, and (2) he knew to contact UGA affiliates Wiles, Ybarra, and Zaninovich to undermine these affiliates' relationships with UGA and induce these affiliates to stop referring clients to UGA.

150. He retained this information in his personal email and on his personal computer.

151. Upon information and belief, Defendant also retained UGA's financial information, including information regarding its commercial contract with 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez. This is information that UGA considers to be confidential and privileged.

152. Furthermore, UGA considers the identities and contact information of its referral sources, including Wiles, Ybarra, and Zaninovich confidential and privileged.

153.    Upon information and belief, Defendant even met Ybarra and Zaninovich through UGA's connections and investment in conventions and other marketing efforts.

154.    Again, he retained their information in his personal email and on his personal computer.

155.    UGA's Confidential Information did not become generally known to and available for use by the public other than as a result of Defendant's acts or omissions in violation of the NDA.

156.    UGA's Confidential Information was not within Defendant's possession prior to its being obtained by Defendant in the course of Defendant's association with UGA.

157.    Upon information and belief, Defendant did not receive any request to disclose Confidential Information pursuant to any legal proceedings, governmental or regulatory process, or any similar process

158.    68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez are Clients of UGA as defined in the TEA and the NDA.

159.    After the Separation Date, Defendant used and/or disclosed UGA's Confidential Information to locate and target 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC and Vasquez without authorization in breach of the NDA. *See* Ex. F, Emails with UGA and 68 Produce LLC.

160.    The NDA provides for injunctive relief and awards attorneys' fees to the prevailing party. *See* Ex. B, NDA, ¶¶ 12, 18.

161.    As a direct and proximate result, UGA has suffered and will continue to suffer irreparable harm, including loss of client relationships and goodwill, and monetary damages in an amount to be determined at trial, but in no event less than $200,000.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT

162.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

163.    UGA had valid and enforceable contracts with 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez during the relevant period.

164.    Pursuant to the TEA and the NDA, Defendant had knowledge of and access to Confidential Information, including UGA's client information.

165.    Defendant intentionally and improperly induced UGA's clients to terminate their contracts with UGA by soliciting the clients to move their business away from UGA and by making false, disparaging statements about UGA's services and integrity. *See* Ex. F, Emails with UGA and 68 Produce LLC, T&D Honeybee, and Direct Advantage Farms LLC.

166.    Defendant actually and intentionally caused 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez to terminate their contracts with UGA.

167.    But-for Defendant's wrongful conduct, 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez would not have terminated their contracts with UGA.

168.    Defendant intentionally and improperly interfered with the contractual relationships between UGA and its clients that were referred to UGA by affiliate Wiles.

169.    Defendant intentionally and improperly interfered with the contractual relationships between UGA and its clients that were referred to UGA by affiliate Ybarra.

170.    Defendant also intentionally and improperly interfered with the contractual relationships between UGA and its clients that were referred to UGA by affiliate Zaninovich.

171.    As a direct and proximate result, UGA suffered damages in an amount of at least $180,000, including lost fees, lost profits, and harm to goodwill.

172.    Defendant is acting solely and exclusively for the purpose of injuring Plaintiff.

173.    Punitive damages are warranted given Defendant's malice and egregious conduct.

## COUNT IV
## TORTIOUS INTERFERENCE - PERSONNEL

174.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

175.    Defendant maintains ongoing at-will relationships with its workforce, including with Sessions and other team members essential to UGA's delivery of services and client relationships.

176.    Defendant knew of UGA's relationships with its personnel and the centrality of those relationships to UGA's business operations by virtue of his former role and exposure to UGA's Confidential Information.

177.    Before the Separation Date, Defendant intentionally contacted UGA personnel, including but not limited to Sessions, to—upon information and belief—induce her to resign from UGA and/or otherwise disrupt her performance of duties from UGA.

178.    Defendant did so with the intention of harming UGA's business operations.

179.    But for Defendant's wrongful interference, UGA's personnel, including Sessions, were reasonably probable to continue their association and performance with UGA.

180.    As a direct and proximate result, UGA suffered damages in the amount of at least $180,000, including lost fees, lost profits, and harm to goodwill and morale.

181.    Punitive damages are warranted given Defendant's malice and egregious conduct.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

182.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

183.    UGA had business relationships and a reasonable expectancy of economic benefit

with existing and prospective clients, including but not limited to:

   a.   68 Produce LLC;

   b.   T&D Honeybee;

   c.   Direct Advantage Farms LLC;

   d.   Vasequez;

   e.   Existing clients referred to UGA by affiliate Wiles;

   f.   Prospective clients that would have been referred by affiliate Wiles;

   g.   Existing clients referred to UGA by affiliate Ybarra;

   h.   Prospective clients that would have been referred by affiliate Ybarra;

   i.   Existing clients referred to UGA by affiliate Zaninovich;

184.   Prospective clients that would have been referred by affiliate Zaninovich.

185.   Defendant knew of these relationships and expectancies by virtue of his role and access to UGA's contracts, proposals, pricing, strategies, and contact information.

186.   Defendant intentionally and wrongfully interfered with these relationships through independently tortious and wrongful means, including (a) breach of his contractual non-solicitation and confidentiality obligations and (b) defamation and disparagement, with the purpose of harming UGA and diverting existing and prospective business. *See* Ex. F, Emails with UGA and 68 Produce LLC and Direct Advantage Farms LLC.

187.   But for Defendant's wrongful interference, UGA would have realized the expected benefits of these relationships.

188.   Defendant is acting solely to harm Plaintiff's economic interests, goodwill, and reputation.

189.   As a direct and proximate result, UGA suffered damages in an amount of at least

24

$180,000, including lost fees, lost profits, and harm to goodwill.

190.    UGA intends to seek punitive damages for Defendant's willful and malicious conduct.

**COUNT VI**
**DEFAMATION PER SE**

191.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

192.    First, Defendant published false statements of fact to UGA's clients, including but not limited to 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez.

193.    Upon information and belief, Defendant falsely stated to 68 Produce LLC, T&D Honeybee, and Vasquez that UGA was improperly and fraudulently using funds pursuant to federal programs such as MASC. *See* Ex. F, Emails with UGA, 68 Produce LLC, and Direct Advantage Farms LLC.

194.    Second, Defendant published false statements of fact to UGA's affiliates, including but not limited to Wiles, Ybarra, and Zaninovich.

195.    Upon information and belief, Defendant falsely stated to UGA's affiliates that UGA was engaged in illegal activities, including by excessive and illegal fees. *See* Ex. F, Emails with UGA, 68 Produce LLC, Direct Advantage Farms LLC.

196.    Third, Defendant published false statements of fact to current personnel of UGA. Upon information and belief, Defendant disparaged UGA and Tacher to UGA's personnel, including Sessions.

197.    The statements were false, published to third parties, and constituted defamation per se because they tend to injure UGA in its trade, business, and profession.

198.    Damages are presumed. In addition, UGA seeks presumed, actual, and punitive

damages.

## COUNT VII
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836 ET SEQ.
## (DTSA)

199.     UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

200.     UGA owns and maintains trade secrets, including without limitation:

  a.   Client lists and contact identities;

  b.   Decision-maker information;

  c.   Client buying records and habits;

  d.   Pricing, proposals, engagement status and pipeline data;

  e.   Marketing and sales strategies; and

  f.   Other non-public business information (collectively, the "Trade Secrets").

201.     These Trade Secrets derive independent economic value from not being generally known to, and not readily ascertainable by, persons who can obtain economic value from their disclosure or use.

202.     UGA takes reasonable measures to keep its Trade Secrets secret, including requiring personnel—like Defendant—to execute the Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement as a condition of association.

203.     These reasonable measures are shown by the Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement, which imposes broad confidentiality obligations that prohibit any unauthorized use or disclosure of confidential information and recognizing UGA's right to injunctive relief for breach.

204.     UGA's Trade Secrets relate to services used in, and intended for, interstate commerce, including nationwide grant consulting and facilitation services to farmers and

agricultural businesses.

205.    Defendant misappropriated UGA's Trade Secrets by acquiring, using, and/or disclosing them without UGA'S consent and in breach of his duties, including client lists, contact details, pricing, proposals, and engagement/pipeline information to locate, target, solicit, and attempt to divert UGA's clients.

206.    Defendant's misappropriation was willful and malicious.

207.    Defendant's conduct has caused immediate and irreparable injury to UGA, including loss of client relationships and goodwill, unfair competitive harm, and the erosion of the secrecy and value of UGA'S Trade Secrets.

208.    Defendant will continue to cause immediate and irreparable injury to UGA unless enjoined.

209.    UGA has no adequate remedy at law for this harm.

210.    UGA is entitled to injunctive relief, damages for actual loss in the amount of at least $180,000, for Defendant's willful and malicious misappropriation under 18 U.S.C. 1836.

**COUNT VIII**
**MISAPPROPRIATION OF TRADE SECRETS**

211.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

212.    UGA's Trade Secrets constitute protectable trade secrets under New York common law.

213.    UGA's Trade Secrets are not generally known to the public outside of UGA.

214.    UGA' s Trade Secrets derive independent economic value from their secrecy.

215.    UGA's Trade Secrets are extremely valuable to UGA.

216.    UGA's Trade Secrets would be extremely valuable to its competitors.

217.    UGA has expended significant amount of effort and money to develop its Trade

Secrets.

218.    UGA's Trade Secrets are subject to reasonable measures to maintain their secrecy.

219.    UGA undertakes reasonable efforts to preserve and guard the secrecy of the Trade Secrets, including requiring personnel —like Defendant—to execute the Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement as a condition of association.

220.    Defendant misappropriated UGA's Trade Secrets by using and/or disclosing them without authorization and through improper means.

221.    Defendant did so in breach of the TEA and breach of the NDA agreements.

222.    Defendant did so to solicit and attempt to divert UGA's clients.

223.    As a direct and proximate result, UGA has suffered damages in the amount of at least $180,000, including lost revenue and profits and diminution of goodwill and competitive damage.

224.    Defendant's conduct has caused immediate and irreparable injury to UGA, including loss of client relationships and goodwill, unfair competitive harm, and the erosion of the secrecy and value of UGA's Trade Secrets.

225.    Defendant will continue to cause immediate and irreparable injury to UGA unless enjoined.

**COUNT IX**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**

226.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

227.    UGA maintains non-public, competitively sensitive Confidential Information.

228.    UGA's Confidential Information is compiled at considerable expense to UGA.

229.    UGA's Confidential Information provides UGA independent economic value from its secrecy.

28

230.    UGA's Confidential Information is subject to reasonable measures to maintain secrecy, including requirements that personnel use trusted login credentials such as usernames and passwords to access such information.

231.    UGA undertakes reasonable efforts to preserve and guard the secrecy of its Confidential Information Secrets, including requiring personnel—like Defendant—to execute the Non-Disclosure, Confidentiality, Non-Competition and Non-Solicitation Agreement as a condition of association.

232.    The NDA that Defendant signed prohibits all personnel, including Defendant, from "disclosing, using, or permitting access, to any unauthorized person or entity, including within the Company, or use for the Employee's own purposes or gain, or that of any friend, relative or other third party, any Confidential Information without the prior written consent of the Company[.]" *See* Ex. B, NDA, ¶ 8.

233.    After the Separation Date, Defendant engaged in wrongful conduct.

234.    First, Defendant wrongfully retained Confidential Information in his personal email and on his personal computer.

235.    Second, Defendant wrongfully disclosed UGA's Confidential Information to unauthorized persons and entities.

236.    These unauthorized persons and entities included but are not limited to UGA affiliates Wiles, Ybarra, Zaninovich, along with UGA clients 68 Produce LLC, T&D Honeybee, Direct Advantage Farms LLC, and Vasquez.

237.    Defendant's wrongful taking and disclosure of Confidential Information was undertaken willfully and maliciously, in bad faith, and with knowledge of his contractual duties.

238.    As a direct and proximate result, UGA has suffered damages in the amount of at

least $180,000, including lost revenue and profits and diminution of goodwill and competitive damage.

239.    Defendant's conduct has caused immediate and irreparable injury to UGA, including loss of client relationships and goodwill, unfair competitive harm, and the erosion of the secrecy and value of UGA's Confidential Secrets.

240.    Defendant will continue to cause immediate and irreparable injury to UGA unless enjoined.

## COUNT X
## ATTORNEYS' FEES

241.    UGA repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

242.    The NDA contains a prevailing party attorneys' fee clause.

243.    Plaintiff is entitled to recover its attorneys' fees, costs, and expenses associated with this Action.

244.    Upon information and belief, Plaintiff's attorneys' fees, costs, and expenses will exceed $100,000 in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    An Emergency, Temporary Restraining Order and Preliminary Injunction enjoining Defendant, and all persons in active concert or participation with him, from:

1.    using, disclosing, transmitting, or misappropriating any UGA Confidential Information;

2.    directly or indirectly contacting, soliciting, servicing, or attempting to divert any UGA "Clients" (as defined in the NDA) for purposes competitive with UGA during

the applicable Non-competition / Non-Solicitation Period; and

3. requiring immediate preservation, return, and/or verified destruction of all UGA Confidential Information in his possession, custody, or control, wherever located;

4. requiring immediate preservation, return, and/or verified destruction of all UGA Confidential Information in his possession, custody, or control, wherever located.

B. Following trial, a Permanent Injunction enjoining Defendant, and all persons in active concert or participation with him, from the below, for the remainder of the applicable Non-competition Period and permanently as to confidentiality and non-disparagement regarding false statements adjudicated herein:

1. using, disclosing, transmitting, or misappropriating any UGA Confidential Information;

2. directly or indirectly contacting, soliciting, servicing, or attempting to divert any UGA "Clients" (as defined in the NDA) for purposes competitive with UGA during the applicable Non-competition / Non-Solicitation Period; and

C. An order requiring Defendant, within five (5) business days, to:

1. identify in writing all persons and entities to whom he has disclosed any UGA Confidential Information;

2. identify all devices, email accounts, cloud accounts, phone numbers, and messaging handles used to store or transmit such information;

3. deliver for forensic imaging (by a neutral expert at Defendant's expense) any devices and media used to store or transmit UGA's Confidential Information; and

4. certify under penalty of perjury full compliance with the Court's orders.

D. Damages in the monetary amount of at least $180,000.00, including compensatory

damages for lost profits and other losses; general damages for reputational harm; and punitive damages.

      E.       Attorneys' fees and costs as provided by contract and otherwise permitted by law.

      F.       Pre- and post-judgment interest as permitted by law.

      G.       Such other and further relief as the Court deems just and proper.

<b><u>JURY DEMAND</u></b>

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 4, 2026        Respectfully submitted,

By: */s/ Andrew T. Lolli*
    Glen H. Waldman, Esq. (*Pro Hac Vice Forthcoming*)
    Andrew T. Lolli, Esq.
    **ARMSTRONG TEASDALE LLP**
    400 Park Avenue, 12th Floor
    New York, New York 10022
    212-209-4433
    alolli@atllp.com
    gwaldman@atllp.com

Docusign Envelope ID: D7674EB4-781E-4406-8E15-BB684E0A1C76

## **VERIFICATION**

I, Elias Blake Tacher, declare under penalty of perjury under the laws of the United States that the foregoing Complaint is true and correct.

Executed on this 3rd day of March, 2026.

Signed by:

*Elias Tacher*

5DE7A076D7BB447...

Elias Tacher
Sole Member, United Grants of America, LLC